IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AMY K. POHL,                          )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )     Civil Action No. 09-1480
                                      )
UNITED STATES ENVIRONMENTAL           )
PROTECTION AGENCY, UNITED             )
STATES DEPARTMENT OF HEALTH           )
AND HUMAN SERVICES, CENTERS           )
FOR DISEASE CONTROL AND               )
PREVENTION, NATIONAL                  )
INSTITUTES OF HEALTH,                 )
NATIONAL INSTITUTE OF                 )
ENVIRONMENTAL HEALTH                  )
SCIENCES, DR. BRUCE LANPHEAR          )
and CHILDREN'S HOSPITAL               )
MEDICAL CENTER,                       )
                                      )
          Defendants.                 )

**MEMORANDUM**

**INTRODUCTION**

Before the Court is the motion of Plaintiff, Amy K. Pohl ("Ms.
Pohl"), for an award of attorneys' fees and costs under the Freedom
of Information Act ("FOIA"), 5 U.S.C. § 552.  For the reasons set
forth below, the motion will be denied.

**BACKGROUND**

FOIA was enacted to ensure public access to government
information.  The purpose of the statute is to permit the public to
scrutinize the government's performance of its duties and promote
governmental honesty.  Manchester v. Drug Enforcement Admin., U.S.
Dept. of Justice, 823 F.Supp. 1259, 1264 (E.D.Pa.1993), aff'd, 40

F.3d 1240 (3d Cir.1994). See also U.S. Dept. of Defense v. Federal Labor Relations Auth., 510 U.S. 487 (1994)(FOIA represents general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language); Rose v. Dept. of the Air Force, 495 F.2d 261, 263 (2d Cir.1974), aff'd, 425 U.S. 352 (1976)(FOIA "was passed in an effort to cure the defects of former section 3 of the Administrative Procedures Act ..., which 'was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute.' Courts have noted that the Act's remedial purpose was to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.").

By its terms, FOIA applies only to requests for agency records. 5 U.S.C. § 552(a)(3). A federal regulation, however, imposes additional duties on government agencies when the subject of a FOIA request involves federally funded research data in the possession of a grant recipient that was used in developing agency action having the force and effect of law. Specifically, revised Circular A-110 of the Office of Management and Budget ("OMB"), which is codified at 2 C.F.R.     § 215.36, states:

> Part 215. Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations (OMB Circular A-110)
>
> *   *   *
>
> (d)(1) ..., in response to a Freedom of Information Act (FOIA)

request for research data relating to published research findings produced under an award that was used by the Federal Government in developing an agency action that has the force and effect of law, **the Federal awarding agency shall request, and the recipient shall provide**, within a reasonable time, the research data so that they can be made available to the public through the procedures established under the FOIA.  If the Federal awarding agency obtains the research data solely in response to a FOIA request, the agency may charge the requester a reasonable fee equaling the full incremental costs of obtaining the research data.  This fee should reflect costs incurred by the agency, the recipient, and the applicable subrecipients.... (emphasis added).

                              *    *    *

2 C.F.R. § 215.36(d)(1).[1]

On October 15, 2008, the Environmental Protection Agency ("EPA")

adopted a new National Ambient Air Quality Standard ("NAAQS") for

lead, significantly decreasing the amount of lead permitted in the

air.[2]  In support of this action, the EPA relied on, among other

things, a federally funded study known as Low-Level Environmental

Lead Exposure and Children's Intellectual Function: An International

---

[1] As noted by the district court in Salt Institute v. Thompson, Sec'y, U.S. Dept. of Health and Human Servs., 345 F.Supp.2d 589 (E.D.Va.2004), Congress added two sentences to the Fiscal Year 1999 Omnibus Consolidated Emergency Supplemental Appropriations Act that were designed to require federal agencies to make available to the public under FOIA research data produced by federal grantees in certain circumstances.  Termed the Shelby Amendment, the entire provision stated:

     ... Provided further, That the Director of OMB amends Section -.36 of OMB Circular A-110 to require Federal awarding agencies to ensure that all data produced under an award will be made available to the public through the procedures established under the Freedom of Information Act: Provided further, That if the agency obtaining the data does so solely at the request of a private party, the agency may authorize a reasonable user fee equaling the incremental costs of obtaining data.

After publishing two proposed revisions and receiving over 12,000 comments, OMB published the final revision of Circular A-110 in October of 1999, 64 Fed.Reg. 54926 (October 8, 1999), which became effective April 17, 2000.  345 F.Supp.2d at 595.

[2] Specifically, the NAAQS for lead was cut by 90%.  See 40 C.F.R. § 50.16.

Pooled Analysis ("the Lanphear Study").  The Lanphear Study, which
was funded by the EPA, Centers for Disease Control and Prevention
("CDC") and National Institute of Environmental Health Sciences
("NIEHS"), a component of the National Institutes of Health ("NIH"),[3]
involved analysis of research data from seven international research
projects to determine the association between children's intelligence
test scores and blood lead concentration.[4]  The Cincinnati Children's
Hospital Medical Center ("CCHMC") was the recipient, or grantee, of
the federal funds awarded by the EPA, CDC and NIH for the Lanphear
Study.  Dr. Bruce Lanphear, who was employed by CCHMC at the time,
was the principal investigator.  (Doc. No. 28-1, No. 80, p. 4, fn.2,
No. 87-1, p. 7, ¶ 22).

Ms. Pohl is an attorney with the law firm of Jones Day.  On
August 9, 2007, while the EPA regulatory process for a possible
revision of the NAAQS for lead was ongoing, Ms. Pohl, acting as an
agent for a client, submitted a FOIA request to the EPA which stated
in relevant part:[5]

\*   \*   \*

The undersigned requests certain data related to and/or
reported in the following report published by the Environmental
Protection Agency: Lead Human Exposure And Health Risk

---

3 The CDC and NIH are components of the United States Department of Health and
Human Services ("HHS").  (Doc. No. 54, p. 5, ¶ 27).
4 The research projects analyzed in the Lanphear Study were conducted in Boston,
Massachusetts, Cincinnati and Cleveland, Ohio, Rochester, New York, Mexico City,
Mexico, Port Pirie, Australia and Yugoslavia.  (Doc. No. 28-1).
5 Regarding the FOIA request, Ms. Pohl was represented at all times by Jones Day,
an entity distinct from its members.  Ms. Pohl did not act as an attorney in this
litigation, and no fees are being sought for the time she expended in pursuing the
client's FOIA request.  (Doc. No. 80-6, p. 3, ¶¶ 8-10).

<u>Assessments for Selected Case Studies</u> (July 30, 2007); <u>and</u> in
the January 26, 2007 letter to Lead NAAQS Docket from Zachary
Pekar (EPA OAQPS) regarding "Correction to Errors Identified in
Lanphear et al. 2005 Pooled Analysis Study and Implications for
Pilot Risk Assessment." ...

Kindly treat this FOIA request as a request for **expedited
processing**. There is a compelling need for the information on
an expedited basis. The data and information requested are
needed for several pending civil litigation matter (sic). Our
client's constitutional due process rights to full cross
examination of opposing expert witnesses may be impaired unless
access to the requested data is provided in an expedited manner.
In addition, it is necessary for us to have access to the data
requested in this letter on an expedited basis so that we may
meaningfully assess the report within the applicable public
comment period set by the EPA....

The above-cited report was drafted by the EPA in conjunction
with ICF International, a recipient of federal funding, ...
Under FOIA, the EPA is required to provide access to the data
requested below. None of the exemptions to disclosure set forth
in FOIA (5 U.S.C. § 552(b)) preclude access to the data
requested in this letter. In the event the EPA does not possess
the data requested in this FOIA letter, then the EPA is required
to obtain all data requested in this FOIA letter from ICF
International and to make the data available to the undersigned,
under 2 C.F.R. Part 215.36(d)....

\*     \*     \*

(Doc. No. 87-1, pp. 15-17).[6]

Ms. Pohl's FOIA request was the first request the EPA received that

invoked revised OMB Circular A-110 as a basis for the production of

information.   (Doc. No. 87-3, p. 3, ¶ 3).

On September 21, 2007, Ms. Pohl received notice from the EPA

that her FOIA request had been denied.   The notice stated in part:

\*     \*     \*

---

6 The information relating to the Lanphear Study sought in Ms. Pohl's FOIA request
included data, data collection forms, software programs necessary to review the
data and data dictionaries.  (Doc. No. 87-3, p. 12).

Employees within EPA's Office of Air Quality Planning and Standards conducted a search that was reasonably calculated to uncover records in the Agency's possession and control that were responsive to your request, and have not located any documents responsive to your request.

Although Dr. Zachary Pekar did issue a correction notice regarding this study, EPA identified that error without having reviewed the data underlying the Study.  Likewise, although EPA received, and made publicly available, a corrected table for the Study, EPA did not receive data underlying the study along with the correction table.

You also requested that EPA make the data available under 2 C.F.R. § 215.37 (sic).  This regulation provides that, in certain circumstances, a Federal agency shall request research data from a researcher in response to a FOIA request.  However, this provision only applies where published research findings produced under an award "was (sic) used by the Federal Government in developing an agency action that has the force and effect of law."  2 C.F.R. §215.37(d)(1) (sic);...

As of the date of your request, EPA had cited the Study in support of its draft report, released July 30, 2007, Lead Human Exposure and Health Risk Assessment for Selected Case Studies (as well as an earlier draft report on a pilot version of the lead risk assessment, released December 15, 2006).  This draft report does not have the force and effect of law.  Indeed, the final version of this report will not have the force and effect of law when it is issued.  Rather, it will represent an effort by agency staff to provide relevant information to the Administrator for his use in determining whether it is appropriate to retain or revise the National Ambient Air Quality Standard (NAAQS) for lead....  Accordingly, EPA is not required to obtain data underlying the Study pursuant to 2 C.F.R. § 215.37 (sic) and has not done so.

                    *    *    *

(Doc. No. 87-3, pp. 15-16).

Ms. Pohl appealed the denial of her FOIA request to the EPA's

National FOIA Officer on October 18, 2007.  In the appeal letter, Ms.

Pohl noted that she had requested data from a study cited in <u>Lead</u>

Human Exposure And Health Risk Assessments for Selected Case Studies (July 30, 2007) ("the EPA Lead Report"); the EPA Lead Report had been prepared as part of the EPA's larger agency action of reviewing and potentially revising the NAAQS for lead which is codified at 40 C.F.R. Part 50.16; the EPA Lead Report evaluated several research studies relating to lead exposure and risk assessment, including the Lanphear Study; and the Lanphear Study had been funded by the EPA, CDC and NIH.  Ms. Pohl raised two grounds in support of her appeal. First, Ms. Pohl contended the EPA should conduct a further search for the requested data because the EPA Lead Report could not have been prepared without some review or analysis of the research data underlying the Lanphear Study.  Second, Ms. Pohl claimed the EPA must request and obtain a copy of the research data analyzed in the Lanphear Study under 2 C.F.R. § 215.36 because, contrary to the EPA's position, the EPA Lead Report was part of agency action having the force and effect of law.  (Doc. No. 87-4, pp. 2-16).

By letter dated February 14, 2008, Ms. Pohl was notified that her FOIA appeal had been granted in part and denied in part.  With respect to Ms. Pohl's assertion that the EPA should conduct a further search for the requested data because the EPA Lead Report established the research data had been analyzed by the EPA, the agency's General Counsel confirmed that a reasonable search for records responsive to the FOIA request had been conducted and no records had been found. Therefore, this ground for the appeal was denied.  As to whether the

requested data was subject to 2 C.F.R. § 215.36, and, therefore, the
EPA had an obligation to request and obtain the data from the
recipient of its grant to fund the Lanphear Study, Government counsel
stated:

\*   \*   \*

The original determination was correct that use of the Study
in the Report does not obligate EPA to obtain the data
underlying the study pursuant to 40 C.F.R. § 30.36(d)(1).[7]
However, since the time of that determination EPA has issued an
Advance Notice for Proposed Rulemaking ... for the lead NAAQS
revision ... which cited the Study in presenting and soliciting
comment on evidence and risk-based considerations and regulatory
options for the Administrator's review of the lead NAAQS.
Furthermore, by court order, the Agency must, *inter alia*, issue
its Proposed Rule for the lead NAAQS revision by May 1, 2008.
In light of all these facts and circumstances, I have determined
that your request satisfies the requirement of 40 C.F.R. § 30.36
and therefore, your appeal is granted on this ground.

In accordance with EPA's regulations, EPA will proceed to
process your request in accordance with 40 C.F.R. § 30.36(d)(1),
contact the grant recipient, and will request an estimate of
fees for responding to your request.  Per your original request,
EPA will contact you with an estimate of fees before proceeding
further.

\*   \*   \*

(Doc. No. 87-4, pp. 18-19).

Subsequently, the EPA determined that HHS had been the primary
source of federal funding for the Lanphear study.[8]  On this basis, the
EPA referred Ms. Pohl's FOIA request to HHS for processing on May 29,

---

7 The EPA's implementation of revised OMB Circular A-110 is codified at 40 C.F.R.
§ 30.36(d)(1).
8 As noted <u>supra</u>, 2 of the 3 federal grants funding the Lanphear Study were awarded
by components of HHS.

2008.[9]   (Doc. No. 87-4, pp. 21-22).   In turn, HHS referred Ms. Pohl's FOIA request to the CDC and NIH, the agencies within HHS that awarded grants to CCHMC for the Lanphear Study.   (Doc. No. 28, p. 19, ¶ 79, No. 54, p. 9, ¶ 79).

On June 17, 2008, Pam Wigington, FOIA coordinator for the CDC's Division of Emergency and Environmental Health Services ("EEHS"), received Ms. Pohl's FOIA request.   On that date, Ms. Pohl was informed that her FOIA request had been received by the CDC and would be sent to the areas which may have pertinent records.[10]   Ms. Pohl was advised that a search would be initiated and she would be provided with all releasable agency records as quickly as possible.   Ms. Pohl was cautioned however, that "[a]ll requests are handled on a first-in, first-out basis."[11]   (Doc. No. 87-1, p. 3, ¶¶ 6-7, p. 27).

---

9 According to the declaration of Stephen D. Page, Director of the EPA's Air Quality Planning and Standards Organization, under Section 552(a)(6)(B)(iii)(III) of FOIA, the EPA is permitted to refer a request for information to another federal agency when the records at issue originated with the other agency or the other agency has a substantial interest in the determination of the request; Ms. Pohl's FOIA request was referred to HHS because it appeared to have been the primary funding source for the Lanphear Study; Ms. Pohl never contacted the EPA to challenge the decision to refer her FOIA request to HHS; and the EPA had no further involvement in the processing of Ms. Pohl's FOIA request.   (Doc. No. 87-3, pp. 5-6, ¶¶ 11-13).   In this connection, the Court notes that, contrary to Mr. Page's declaration, Section 552(a)(6)(B)(iii)(III) of FOIA merely defines an "unusual circumstance" justifying extension of the 20-day limit for an agency's response to a FOIA request.   The section does not address referrals of FOIA requests from one agency to another agency.   Nevertheless, because components of HHS were federal awarding agencies with regard to the Lanphear Study, HHS's processing of Ms. Pohl's FOIA request was proper under revised OMB Circular A-110.
10 The NIH acknowledged receipt of Ms. Pohl's FOIA request on July 1, 2008.
11 In this connection, Ms. Pohl's request for expedited processing on due process grounds was denied because insufficient information had been provided to enable the CDC to determine whether expedited processing was appropriate.   (Doc. No. 87-1, p. 27).   By letter dated June 30, 2008, the CDC notified Ms. Pohl a second time that her request for expedited processing was denied.   (Doc. No. 87-1, p. 29).

On June 30, 2008, Ms. Wigington received a copy of revised OMB Circular A-110 on which Ms. Pohl's FOIA request was based.  This was the first FOIA request involving revised OMB Circular A-110 that had ever been received by the EEHS, and there was no policy or practice in place regarding the processing of such a request.  (Doc. No. 87-1, p. 4, ¶ 10).

On July 9, 2008, Ms. Wigington sent the following email to Samantha Harrykissoon, a colleague at the EEHS Lead Poisoning Prevention Branch, inquiring into the status of Ms. Pohl's FOIA request: "How is it going on this FOIA? ... We need to find out what CDC paid for and go to the grantee and ask how much it will cost to reproduce those data.  (Estimates only at this point, not the data)." (Doc. No. 87-1, p. 2, ¶ 11, p. 31).

On July 21, 2008, Ms. Harrykissoon sent an email to Dr. Lanphear regarding Ms. Pohl's FOIA request.[12]  Dr. Lanphear was asked to provide the amount of money that he received from the CDC for the Lanphear study.  He promptly responded, indicating that "it was somewhere between $10,000 to $30,000 to hold a workshop or conduct

---

12 Ms. Pohl takes issue with the fact the CDC initially contacted the principal investigator, rather than the grantee, on the Lanphear Study.  (Doc. No. 80, p. 4). According to Ms. Wigington, the CDC's initial point of contact regarding grant awards is generally the principal investigator named on the notice of grant award because he or she is the individual closest to the information or data at issue. Moreover, because the CDC had questions concerning the funding provided by the CDC for the Lanphear Study, Dr. Lanphear was the best person to explain the manner in which the funds were expended.  Finally, because the CDC's questions related to a specific data set, Dr. Lanphear was the person most likely to have access to a copy of the data.  (Doc. No. 87-1, p. 5, ¶ 13).  The Court finds Ms. Wigington's explanation for initially contacting Dr. Lanphear, rather than CCHMC, abundantly reasonable.  In any event, when efforts to obtain the research data from Dr. Lanphear were not successful, the CDC promptly contacted CCHMC.

the analyses." Dr. Lanphear noted, however, that it did not matter
because "the stipulation and agreement I had with the other
investigators who shared their raw data was that the data would not
be shared with any other party for any other reason."[13]   (Doc. No. 87-
1, p. 34).

The next day, Ms. Harrykissoon sent an email to Dr. Lanphear
requesting a copy of the co-investigators' confidentiality agreement.
Dr. Lanphear responded as follows: "If the legal firm that is
requesting the agreement is Jones Day or if they were involved in the
RI lead suit, they already have a copy of the agreement.  It is also
part of the official records of the RI suit."  (Doc. No. 87-1, p.
40).  Ms. Harrykissoon forwarded Dr. Lanphear's email to Ms.
Wigington who responded as follows: "Our FOIA office needs a copy of
this.  We do not have access to this information."  (Doc. No. 87-1, p.
52).  Ms. Harrykissoon then sent the following email to Dr. Lanphear:
"The copy of the agreement is not for the law firm but for our FOIA
office to retain in their records."  (Doc. No. 87-1, p. 46).

On July 23, 2008, Ms. Harrykisson reported to Ms. Wigington that
she had not yet received a response from Dr. Lanphear.[14]  A week
later, Ms. Wigington learned that Dr. Lanphear had moved to

---

13 Dr. Lanphear also stated: "The legal firm who is requesting the data is aware of
this because they have tried to get it through a court order, the US EPA and now
the CDC."  (Doc. No. 87-1, p. 34).
14 On July 25, 2008, Ms. Wigington received the Notice of Grant Award which showed
that Dr. Lanphear received funding from the CDC to analyze existing data sets from
seven international studies of children who had low blood lead levels.  (Doc. No.
87-1, p. 6, ¶ 16).

Vancouver, British Columbia, Canada and was no longer affiliated with CCHMC.  (Doc. No. 87-1, p. 7, ¶¶ 20-21).

On July 30, 2008, as a result of Dr. Lanphear's failure to respond to her July 22nd email, Ms. Harrykissoon contacted Connie Hopkins, Compliance Officer at CCHMC's Research Division, to obtain a copy of the confidentiality agreement between Dr. Lanphear and his co-investigators on the Lanphear Study.[15]  (Doc. No. 87-1, pp. 56-57). On August 12, 2008, Ms. Hopkins notified Ms. Harrykissoon that she had located the box containing the grant information in an off-site storage area, and that she should have the box in a day or two.[16] (Doc. No. 87-1, p. 56).  On August 19, 2008, Ms. Hopkins provided Ms. Harrykissoon with the information CCHMC had located.  The co-investigators' confidentiality agreement and the research data analyzed in the Lanphear Study were not included.  (Doc. No. 87-1, p. 8, ¶ 24).

On August 27, 2008, the CDC's General Counsel sent a letter to Dr. Lanphear in Canada regarding his failure to provide CDC personnel

---

15 Ms. Pohl maintains the Government Defendants did not contact CCHMC "until a year after [she] filed this case (more than two years after the Government misrepresented to Plaintiff that it was in negotiations with the grantee) and CCHMC had been added as a Defendant."  (Doc. No. 80, p. 12).  To support this assertion, Ms. Pohl submitted a letter sent by CCHMC's counsel to Jones Day on October 24, 2011, in which counsel states that CCHMC did not become aware of Ms. Pohl's FOIA request until CCHMC received a letter from the EPA on April 13, 2010, five months after this case was filed.  (Doc. No. 80-6, p. 8).  Contrary to counsel's representation, the evidence that the CDC contacted CCHMC through Ms. Hopkins in July 2008 is uncontroverted.  Thus, CCHMC was made aware of Ms. Pohl's FOIA request a year and a half before this case was filed, not five months after the case was filed.
16 Ms. Harrykissoon promptly forwarded Ms. Hopkin's email to Ms. Wigington.  (Doc. No. 87-1, p. 59).

with a copy of the confidentiality agreement among the co-investigators on the Lanphear study.  The letter stated:

* * *

> Please keep in mind that the closeout of the CA does not affect
> the continuing property management requirements of 45 C.F.R.
> sections 74.31-74.37 that you agreed to upon acceptance of the
> CA funding.  Award recipients are required to retain records for
> three years following the conclusion of the award; therefore,
> while we realize that you may no longer have the data, you have
> not indicated that that is the case.  In fact, you have
> indicated that the reason for not releasing the data to CDC is
> not that you no longer possess it, but that you signed a
> confidentiality agreement.  Therefore, if you are still in
> possession of the data, you must comply with the requirements of
> 74.36(d).[17]

* * *

(Doc. No. 87-1, p. 8, ¶ 25, p. 63).

Dr. Lanphear responded to the letter from the CDC's General

Counsel by email on September 29, 2008, stating in part:

* * *

> As I indicated when we talked on the telephone, Jones-Day (sic)
> already has a copy of the agreement I made with each of the co-
> investigators (see attached).[18]  They received it during the
> Rhode Island suit against the paint and pigment industry.
> Indeed, they used it to successfully argue against my testifying
> at the trial even though I released all of the raw data from my
> own studies.
>
> As I indicated in the letter, the investigators provided the raw
> data with the stipulation that it would not be released or used
> for any other reason than the pooled analysis unless additional
> approval was sought and obtained from each investigator.

---

17 The CDC's implementation of revised OMB Circular A-110 is codified at 45 C.F.R.
§ 74.36.
18 Dr. Lanhear attached 2 documents to the email that refer to the co-
investigators' confidentiality agreement.  He did not, however, attach the actual
agreement.  (Doc. No. 87-1, pp. 69-70).

You (or Jones-Day (sic)) can, of course, seek approval from each
investigator.

*    *    *

(Doc. No. 87-1, p. 67).

Following Dr. Lanphear's response, the CDC's FOIA Officer instructed
Ms. Wigington to contact all the researchers involved in the Lanphear
Study, including Dr. Lanphear, to obtain their approval for release
of the research data.   (Doc. No. 87-1, pp. 8-9, ¶ 27).

On October 6, 2008, a CDC FOIA Officer sent an "interim
response" to Ms. Pohl's FOIA request, indicating that "[p]rogram
staff are negotiating the availability of the data and the cost of
providing it with the grantee."   (Doc. No. 80-6, p. 6).

On October 24, 2008, Ms. Wigington sent a letter with enclosures
to each researcher who participated in the Lanphear Study.   Ms.
Wigington could not confirm that the letter package was received by
the researcher in Mexico.   The letter package sent to Dr. Claire
Ernhart at the University of South Carolina Beaufort was returned
because the doctor could not be located.   Professor Peter Baghurst,
Head of the Public Health Research Unit at Women's and Children's
Hospital in South Australia, responded to Ms. Wigington's letter
package by email on November 3, 2008, refusing to "give permission to
CDC or any other person to access our data.   According to Dr.
Baghurst, "the data you were seeking were not obtained using CDC
funds and therefore your assertion that our data are subject to OMB

14

Circular A-110 and 45 C.F.R. section 74.36(d) is incorrect." Richard L. Canfield, PhD, Division of Nutritional Sciences at Cornell University, responded to Ms. Wigington's letter package on November 10, 2008 as follows: "After speaking with Bruce Lanphear I learned that the data set requested of me ... has already been provided by him. How shall I proceed?" In response, Ms. Wigington informed Dr. Canfield that Dr. Lanphear had not provided any data, only the co-investigators' agreement not to share the data. She then asked Dr. Canfield for permission for Dr. Lanphear to provide his data to the CDC. Dr. Kim Dietrich faxed correspondence between his attorney and an attorney at Jones Day to Ms. Wigington in response to the letter package, which indicated that his data had been provided to Jones Day in response to a subpoena in the Rhode Island litigation. As to the remaining researchers who participated in the Lanphear Study, Ms. Wigington did not receive any response to her letter package. (Doc. No. 87-1, p. 9, ¶¶ 27-31, pp. 72-84, 87-88, 91-92).

On November 13, 2008, Ms. Wigington sent an email to Dr. Lanphear to confirm the reason for his refusal to produce the research data analyzed in the Lanphear Study, i.e., 45 C.F.R. 74.36(d)(2)(i)(A) excludes from disclosure "trade secrets, confidential information, materials necessary to be held confidential by a researcher until they are published, and similar information which is protected under law." (Doc. No. 87-1, p. 10, ¶ 32).

On December 2, 2008, Matthew A. Meyers, Esquire of Jones Day sent a letter to the CDC inquiring into the status of Ms. Pohl's FOIA request.  Attorney Meyers noted Ms. Pohl was informed by the EPA on June 30, 2008 that her FOIA request had been transferred to the CDC for processing; it had been five months since Ms. Pohl had received any communication regarding the FOIA request;[19] he recently learned Dr. Lanphear had moved to Vancouver, British Columbia, Canada; and he hoped this development would not delay further the processing of Ms. Pohl's FOIA request.  (Doc. No. 87-1, p. 101).

Having received no response from Dr. Lanphear to her November 13th email, Ms. Wigington sent another email on December 11, 2008, requesting confirmation of his reason for not producing the research data requested by Ms. Pohl.  Dr. Lanphear responded as follows:

* * *

On behalf of the investigators who were involved with the international pooled analysis of lead-exposed cohorts, I am contending that a stipulation of the agreement to use these data was that they would be treated as confidential and would not be used or shared for any other purpose.  This is consistent with the exclusion, "the research data includes similar information which is protected under the law" by a prior agreement.

Moreover, although many of the investigators were comfortable making their raw data available, our international colleagues were not willing to release their data.  As such, it would not be possible to release the pooled data set.

(Doc. No. 87-1, p. 10, ¶¶ 33-34, pp. 94, 96, 98).

---

19 In fact, it had been 2 months since Ms. Pohl had received correspondence from the CDC regarding her FOIA request.  As noted previously, a CDC FOIA Officer sent an "interim response" to Ms. Pohl on October 6, 2008.  (Doc. No. 80-6, p. 6).

On December 16, 2008, the CDC notified Ms. Pohl of the denial of
her FOIA request under 45 C.F.R. § 74.36(d)(2)(i)(A), which excludes
from disclosure "similar information which is protected under law."
The CDC noted that the grantee had been contacted regarding the
availability of the data; and that the grantee claimed the requested
data were excluded from FOIA based on a private agreement among the
co-investigators whose research data were pooled and analyzed in the
Lanphear Study, an agreement which had been reached at the outset of
collaboration.  (Doc. No. 87-1, pp. 103-04).

Two days later, the NIH notified Ms. Pohl that NIEHS files had
been searched to determine whether the research data responsive to
her FOIA request had been produced under an NIEHS grant which
satisfied the criteria for processing a FOIA request under revised
OMB Circular A-110; the NIEHS grant referenced by Dr. Lanphear in his
article regarding the Lanphear Study was a conference grant that
supports recipient sponsored and directed international, national or
regional meetings, conferences and workshops; the grant awarded by
NIEHS had been used to fund travel expenses for Dr. Lanphear to
conduct a workshop for the purpose of establishing groundwork for the
pooled analysis; and no research data were produced or analyzed at
the workshop.  As a result, revised OMB Circular A-110 did not apply
to the NIEHS grant and the NIH denied Ms. Pohl's FOIA request.  (Doc.
No. 28-5, pp. 2-3).

On January 9, 2009, Ms. Pohl filed an administrative appeal of the denials of her FOIA request by the CDC and NIH with HHS.  (Doc. No. 87-1, pp. 106-24).  Thereafter, on February 20, 2009, HHS's General Counsel forwarded the appeal to Dr. Lanphear for comment on the two arguments raised by Ms. Pohl in the appeal, i.e., (1) the confidentiality agreement among the co-investigators whose research data were analyzed in the Lanphear Study did not meet the criteria for the exclusion in revised OMB Circular A-110 relied upon to not produce the pooled data, and (2) recognizing such confidentiality agreements essentially allows researchers to circumvent the FOIA process.  Dr. Lanphear never responded.  (Doc. No. 87-1, p. 11, ¶¶ 37-39, pp. 126-27).

HHS's regulations require a decision on a FOIA appeal "within 20 working days after the appeal reaches the appropriate review official."  See 45 C.F.R. § 5.35(b)(2).  With respect to HHS's failure to comply with this regulation in processing Ms. Pohl's appeal, Carol Maloney, FOIA Officer for HHS's Program Support Center ("PSC"), submitted an uncontroverted declaration in support of the Government's opposition to Ms. Pohl's request for attorneys' fees and costs under FOIA.  Ms. Maloney's declaration states that her duties include responding to initial FOIA requests for records generated by all components of the PSC, the Office of the Assistant Secretary for Health and the Office of Human Resources; in addition, she is the Administrative Appeals FOIA Officer for all public health agencies

18

within HHS's Public Health Service ("PHS"); she processes
administrative appeals for the CDC and NIH; she processed Ms. Pohl's
appeal; at the time, her office was experiencing a severe staffing
shortage and a large backlog of work; any delay in processing Ms.
Pohl's appeal was not unusual given the staffing shortage and
backlog; between July 1, 2009 and November 30, 2009, her office
processed only 61 of the 145 pending appeals; during the fiscal year
2009 (October 1, 2008 to September 30, 2009), the average time for
her office to process a FOIA appeal exceeded 9 months; and although
some appeals were processed fairly quickly because the PHS's
Operating Divisions and the appellants came to an agreement regarding
the issues presented in the appeal, such a resolution was not
possible in this case because neither the CDC nor the NIH had the
requested data in their possession.[20]   (Doc. No. 87-1, pp. 2-36).

**HISTORY OF LITIGATION**

Ms. Pohl filed the present action against the EPA, HHS, CDC, NIH
and NIEHS (collectively, "the Government Defendants") on November 5,
2009.  In Count I, Ms. Pohl alleged the Government Defendants

---

20 Regarding the backlog of work in her office, Ms. Maloney averred that prior to
her appointment as PHS's FOIA Officer in February 2008, both the director and
senior positions in the division were vacant; the prior FOIA Officer had suffered
an extended illness and died unexpectedly, resulting in a substantial backlog of
FOIA requests and appeals; when she filled the position of FOIA Officer, there was
a 100% turnover of the appeals staff; throughout 2008, she had only 2.5 staff,
including herself, allotted to work in the office; Ms. Pohl's appeal was processed
in the same manner as other appeals received by her office; her office did not
respond to Jones Day's second inquiry into the status of Ms. Pohl's appeal due to
the volume of work in her office; and her office received many status inquiries in
regard to the backlog of FOIA appeals, but was unable to respond to every inquiry
given the office's limited resources.  (Doc. No. 87-2, pp. 4-6, ¶¶ 7-17).

violated FOIA and revised OMB Circular A-110 by refusing to obtain

and produce the research data analyzed in the Lanphear Study in

response to her FOIA request.  In Count II, Ms. Pohl alleged the

manner in which the Government Defendants processed her FOIA request

violated FOIA and the Administrative Procedures Act ("APA").[21]  (Doc.

No. 1).  The Government Defendants' answer to Ms. Pohl's complaint

was filed on December 7, 2009.  (Doc. No. 6).

Following the initial case management conference on December 17,

2009, the Court entered an Order referring the case to Early Neutral

Evaluation.  (Doc. No. 8).  Approximately a month later, the

Government Defendants filed a motion to transfer the case to non-

binding arbitration.[22]  (Doc. No. 9).  In response to the motion to

transfer, Ms. Pohl asserted that the Court "should exercise its

inherent power to excuse the parties from ADR and to refer this

matter to a Magistrate Judge to identify the core legal issues and

assist in crafting an appropriate case management process for this

Court's consideration."[23]  (Doc. No. 10).  On March 3, 2010,

Defendants' motion to transfer the case to non-binding arbitration

---

21 The APA "authorizes suit by [a] person suffering legal wrong because of agency
action, or adversely affected or aggrieved by agency action within the meaning of a
relevant statute." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 61
(2004), quoting 5 U.S.C. § 702. However, "Congress did not intend the general
grant of review in the APA to duplicate existing procedures for review of agency
action." Schaeuble v. Reno, 87 F.Supp.2d 383, 393-94 (D.N.J.2000), citing Bowen v.
Massachusetts, 487 U.S. 879, 903 (1988).
22 Noting that the Court's Local Rules and its ADR Policies and Procedures require
defendants to pay half the cost of an evaluator's services unless otherwise agreed
by all parties or ordered by the Court, the Government Defendants argued that
"principles of sovereign immunity likely preclude the possibility of assessing the
cost of Early Neutral Evaluation to the government."  (Doc. No. 9).
23 According to Ms. Pohl, "[t]his solution resolves the Government's purported cost
concern, while simultaneously moving the case forward...."  (Doc. No. 10).

and Ms. Pohl's request to excuse the parties from ADR and refer the

matter to a Magistrate Judge were denied.   (Doc. No. 12).

Thereafter, the parties participated in Early Neutral Evaluation.   On

April 20, 2010, the Court was notified by the Neutral that the case

had not been resolved.   (Doc. No. 18).

On May 7, 2010, Ms. Pohl moved to amend her complaint to assert

additional claims against the Government Defendants, add claims

against CCHMC and Dr. Lanphear, and add necessary supporting facts

based on newly discovered evidence.[24]   (Doc. No. 21).   Despite the

Government Defendants' opposition to the motion to amend complaint,

the motion was granted by Memorandum Opinion and Order dated June 25,

2010.   (Doc. No. 22, No. 26).

Ms. Pohl filed her amended complaint on July 2, 2010.   Count I

alleged the Government Defendants violated FOIA and revised OMB

Circular A-110 by refusing to obtain and produce the research data

responsive to her FOIA request.   Count II alleged the same conduct

constituted a violation of the APA by the Government Defendants.

Count III alleged the Government Defendants violated the APA by

adopting a general policy of refusing to obtain data requested

pursuant to revised OMB Circular A-110 "if the grant recipients

---

24 Among the newly discovered evidence was the fact the NAAQS for lead had been
significantly reduced without the EPA's review of the actual research data analyzed
in the Lanphear Study.   (Doc. No. 28, p. 6, ¶ 18).   In this regard, the Court notes
that a week after Ms. Pohl moved to amend her complaint, the United States Court of
Appeals for the District of Columbia Circuit held that the EPA's reliance on the
Lanphear Study without obtaining and making public the underlying research data was
not arbitrary and capricious.   See Coalition of Battery Recyclers Assoc. v.
Environmental Protection Agency, 604 F.3d 613, 623-24 (D.C.Cir.2010).

refuse to or decline to turn over the data when requested." Count IV sought a writ of mandamus under 28 U.S.C. § 1361 to compel the Government Defendants to obtain and produce the research data responsive to Ms. Pohl's FOIA request. Count V alleged the Government Defendants violated (1) the process prescribed by FOIA for considering initial requests for information and appeals of adverse determinations,[25] and (2) the APA by unreasonably delaying action on Ms. Pohl's subsequent appeal. Count VI, alleging breach of contract, and Count VII, alleging violation of revised OMB Circular A-110, were brought against CCHMC and Dr. Lanphear. (Doc. No. 28).

On July 30, 2010, the Government Defendants moved to dismiss the APA claims in Counts II, III and V of Ms. Pohl's amended complaint under Fed.R.Civ.P. 12(b)(1) or, alternatively, under Fed.R.Civ.P. 12(b)(6), and the claim for a writ of mandamus in Count IV under Fed.R.Civ.P. 12(b)(6). (Doc. No. 30).

By Memorandum Opinion and Order dated October 29, 2010, the Government Defendants' partial motion to dismiss Ms. Pohl's amended complaint was granted in part and denied in part. (Doc. No. 48). First, the Court concluded the research data requested by Ms. Pohl were not "agency records" subject to FOIA. Rather, regulations of the EPA and HHS implementing revised OMB Circular A-110 required the agencies to request the research data sought by Ms. Pohl from the

---

25 Specifically, Ms. Pohl alleged: "FOIA provides no procedure by which one agency may decide an appeal granting access to records or data and then may transfer that request for reexamination and denial by another agency." (Doc. No. 28, p. 27, ¶ 134).

recipient of the grants awarded to fund the Lanphear Study. Because
FOIA does not include this requirement, FOIA could not provide an
adequate remedy for the agencies' failure to produce the research
data requested by Ms. Pohl. Thus, the Government Defendants' motion
to dismiss the APA claim in Count II was denied.[26] For parallel
reasons, the Court concluded that the motion to dismiss the APA claim
in Count III, which alleged the Government Defendants had consciously
adopted a policy of refusing to obtain research data produced under a
federal grant and utilized in agency action having the force and
effect of law, should be denied. Again, nothing in FOIA requires an
agency to obtain information that is not in its possession.
Therefore, even if Ms. Pohl established that one or more of the
Government Defendants had such a policy, she would have no recourse
against the agency or agencies under FOIA. As to Count V, the Court
concluded that both procedural claims could be brought under FOIA.
Therefore, the Government Defendants' motion to dismiss the APA claim
in Count V, which was the basis for Ms. Pohl's second procedural
claim, was granted. Finally, the Court granted the Government
Defendants' motion to dismiss the mandamus claim in Count IV of Ms.
Pohl's amended complaint because the relief requested, i.e., an order

---

26 Specifically, the research data were not "created or obtained" by the Government
Defendants and the research data were not in the control of the Government
Defendants at the time Ms. Pohl's FOIA request was made. See United States Dept.
of Justice v. Tax Analysts, 42 U.S. 136, 144-45 (1989). (Doc. No. 48, p. 12). On
this basis, a motion to dismiss the substantive FOIA claim in Count I of Ms. Pohl's
amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), would have been granted. The
Government Defendants, however, did not include Count I in their motion to dismiss.

compelling the Government Defendants to obtain and produce the
research data analyzed in the Lanphear Study, was available under
FOIA and/or the APA.[27]

On November 22, 2010, the EPA's FOIA Dispute Decision Official
issued a decision in connection with a FOIA request by Robert N.
Steinwurtzel, counsel for the Association of Battery Recyclers, Inc.,
that was identical to Ms. Pohl's FOIA request.  In fact, the FOIA
Official noted in footnote 1 of the decision that Ms. Pohl had filed
a FOIA request for the research data prior to Mr. Steinwurtzel's
request; Ms. Pohl's FOIA request had been forwarded to HHS for
processing; Ms. Pohl's FOIA request was the subject of litigation in
the Western District of Pennsylvania; and CCHMC and Dr. Lanphear were
parties to that litigation.[28]  (Doc. No. 87-9, p. 8).  The FOIA
Official concluded that the data analyzed in the Lanphear Study was
research data within the meaning of 40 C.F.R. § 30.36(d)(2), because
the Lanphear Study "was produced, at least in part, with funds EPA
provided to CCHMC under the Grant and EPA used the [Lanphear Study]

---

27 In summary, following the Court's ruling on the Government Defendants' partial
motion to dismiss, Ms. Pohl's substantive claims regarding the failure of the
Government Defendants to obtain and produce the research data analyzed in the
Lanphear Study were based on the APA, while her procedural claims relating to the
manner in which her FOIA request and second appeal were processed were based on
FOIA.
28 In his FOIA request, Attorney Steinwurtzel successfully argued that there was no
authority for the EPA's referral of the identical FOIA request submitted by Ms.
Pohl to HHS for processing because HHS "appeared to have been the primary source of
federal funds for the study."  Neither revised OMB Circular A-110 nor 40 C.F.R.
§ 30.36, the EPA's implementation of the revised circular, is limited to the
"primary" source of federal funds, but requires all awarding agencies to obtain the
data in response to a FOIA request.  (Doc. No. 87-9, pp. 15-16).

in developing action that has the force and effect of law." (Doc.
No. 87-9, pp. 7-12).

On November 29, 2010, counsel for CCHMC and Dr. Lanphear sent a
letter to Government counsel, indicating that in light of the
decision of the EPA regarding Attorney Steinwurtzel's FOIA request,
as well as the litigation initiated by Ms. Pohl, his clients had
decided not to further contest their obligation to produce the
research data analyzed in the Lanphear Study.  A CD containing the
research data was enclosed with the letter.  (Doc. No. 87-9, pp. 5-
6).  Government counsel promptly notified Ms. Pohl's counsel of her
receipt of the research data responsive to the FOIA request.  (Doc.
No. 87-9, p. 19).

During a case management conference on December 2, 2010,
Government counsel informed the Court that the research data
responsive to Ms. Pohl's FOIA request recently had been received from
CCHMC and Dr. Lanphear; and that the research data would be reviewed
for FOIA exemptions and likely produced to Ms. Pohl within 8 weeks.
The Court memorialized Government counsel's representations in an
Order directing production of the research data by February 11, 2011,
and scheduling a further conference in March.  (Doc. No. 59).

On January 28, 2011, Government counsel provided Ms. Pohl with a
CD containing the research data.  Government counsel noted that the
production contained the data files and data dictionaries in the
agencies' possession; however, the agencies did not possess data

collection forms and the agencies would not provide "software programs" because computer software is not an "agency record."[29] (Doc. No. 80-1, p. 2).

By letter dated February 18, 2011, counsel for Ms. Pohl notified Government counsel that several files necessary to make the FOIA request complete were missing.  The missing files consisted primarily of data dictionaries containing definitions of the variables referenced in the data files without which the data could not be interpreted.  Counsel indicated the missing files would have to be produced before Ms. Pohl would entertain the possibility of dismissing the case.  (Doc. No. 80-2, pp. 2-4).

On March 4, 2011, Government counsel sent an email to Ms. Pohl's counsel to which additional data files and data dictionaries were attached.  The email indicated that CCHMC and Dr. Lanphear had provided the additional files to the Government in response to counsel's February 18th letter.  The email concluded as follows: "The production of these documents moots your claim against the agency defendants.  I propose that we jointly stipulate to dismiss the case with prejudice, with each party to bear their own costs and fees." (Doc. No. 80-3, p. 2).

Subsequently, an issue arose regarding whether software code utilized in the Lanphear Study should have been included in the FOIA

---

29 Government counsel concluded her letter as follows: "The production of these documents moots your legal claims against the agencies.  I propose that we jointly stipulate to dismiss the case with prejudice, with each party to bear their own costs and fees."  (Docket No. 80-1, p. 2).

production.   On April 4, 2011, counsel for Ms. Pohl sent the

following email to Government counsel regarding an amendment to Ms.

Pohl's FOIA request: "With regard to amending the FOIA request,

please advise if you find the following language a sufficient

description of the file most recently released to you by the

hospital: 'Statistical Analysis Software ('SAS') code used in the

Lanphear Study.'  If this is satisfactory, I will draft an amendment

letter for all the parties (sic) review."  (Doc. No. 80-4, p. 4).

    Government counsel responded on April 6, 2011, stating:

Dear Tony,

Thank you for the email below.  I believe the record which you
are seeking may be responsive to the language stated below.  I
must inform you, however, that EPA considers this a new FOIA
request.  The agencies' position is that the past two
productions have mooted your claims in the present case.

Your prior request sought only data, data collection forms, and
data dictionaries related to the Lanphear study.  EPA does not
consider software code or analysis as included in the terms of
that request.  Furthermore, EPA is unclear that the researcher
is required to produce such code or analysis under the terms of
2 C.F.R. § 215.36(d)(1), which requires only a production of
"research data."  The Shelby Amendment itself, authorizing the
regulation, envisions only production of "data produced under an
award."  ...  However, to the extent that the record has now
become an "agency record" within the meaning of FOIA, the EPA
will review your FOIA request for that record in due course....

I realize that this process may take some time.  I believe EPA
would consider reviewing this new FOIA request in an expedited
manner as part of this litigation, contingent on a settlement
agreement between the parties.

(Doc. No. 80-4, pp. 3-4).

Ms. Pohl's counsel promptly responded, asserting that the EPA's reading of the FOIA request was incorrect.  In particular, in paragraph 2, the FOIA request included "any software programs required to access and analyze the data identified in paragraph 1 in its computerized form."  According to counsel, this language encompasses "software code or analysis."  Thus, the Government Defendants were asked to produce the remaining record in its possession.  (Doc. No. 80-4, p. 2).  Shortly thereafter, Government counsel responded, stating "the agency did consider whether this records (sic) was a 'software program and determined that the researcher's code or analysis does not fall within the meaning of a 'software program,'" and, as stated previously, "the agencies will not provide 'software programs' as computer software is not an 'agency record' subject to production under FOIA."  Counsel concluded the email as follows:

*     *     *

> I continue to convey to you that the agency is willing to work with plaintiff to structure a resolution to this case that is amenable to all parties involved.  We are in unchartered territory here, in terms of FOIA requests, and perhaps it would behoove all the parties to think about a way to end this litigation with a positive outcome for all involved.

(Doc. No. 80-4, p. 2).[30]

During a conference with the Court on May 5, 2011, counsel for CCHMC and Dr. Lanphear reported that all records responsive to Ms.

---

30 Ultimately, the software code requested by Ms. Pohl, which the Government deemed a new FOIA request, was produced by CCHMC as a result of direct communications between Ms. Pohl's counsel and counsel for CCHMC.  (Doc. No. 80-5, p. 2).

Pohl's FOIA request had been produced, and Ms. Pohl's request for attorneys' fees and costs from the Government Defendants under 5 U.S.C. § 552(a)(4)(E) was discussed.[31]   Ms. Pohl and the Government Defendants were directed to provide the Court with a joint status report on settlement negotiations regarding attorneys' fees and costs by June 2, 2011.  (Doc. No. 65).  Thereafter, the period for settlement negotiations between Ms. Pohl and the Government Defendants was extended on two occasions.  (Doc. No. 66, No. 68).

Based on three status reports filed by the parties on August 8 and August 9, 2011, which indicated that a settlement of Ms. Pohl's request for attorneys' fees and costs from the Government Defendants under FOIA had not been reached, a conference was scheduled for August 23, 2011.  (Doc. No. 72).  In light of the parties' continued inability to resolve Ms. Pohl's request for attorneys' fees and costs under FOIA, the Court entered an Order on September 29, 2011.  Ms. Pohl was directed to file a motion for attorneys' fees and costs with a supporting brief and affidavits by October 28, 2011, and the Government Defendants were directed to file their brief in opposition with supporting affidavits by November 28, 2011.  (Doc. No. 78).  The motion and supporting and opposing briefs were filed as directed. (Doc. No. 79, No. 80, No. 87).  In addition, Ms. Pohl moved for leave to file a reply brief which was granted.  (Doc. No. 89, No. 90).  The reply brief was filed by Ms. Pohl on December 12, 2011.

---

31 On May 24, 2011, the parties filed a stipulation of dismissal with prejudice as to CCHMC and Dr. Lanphear, which was approved by the Court.  (Doc. No. 63, No. 64).

**LEGAL ANALYSIS**

FOIA provides that "[t]he court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). The main purposes of FOIA's provision allowing for an award of attorneys' fees and costs to a substantially prevailing party are: (1) "to encourage [FOIA] suits that benefit the public interest," and (2) to provide "compensation for enduring an agency's unreasonable obduracy in refusing to comply with [FOIA]'s requirements." Barnard v. Dept. of Homeland Security, 656 F.Supp.2d 91, 97 (W.D.Pa.2009), citing LaSalle Extension Univ. v. FTC, 627 F.2d 481, 484 (D.C.Cir.1980).

When presented with a request for an award of attorneys' fees and costs under FOIA, the Court must initially determine whether the plaintiff is "eligible" for such an award; that is, whether the plaintiff "substantially prevailed." If so, the Court then must determine whether the plaintiff is "entitled" to an award of attorney fees and costs. A plaintiff is not necessarily "entitled" to an award of attorney fees and costs based on "eligibility" for such an award. See Church of Scientology of California v. U.S. Postal Service, 700 F.2d 486 (9th Cir.1983)(Determination of eligibility for attorney fees under FOIA does not automatically entitle plaintiff to attorney fees; entitlement is left to sound discretion of district court); Westinghouse Elec. Corp. v. N.L.R.B., 497 F.Supp. 82 (W.D.Pa.

1980)(Fact that plaintiff in action under FOIA substantially prevailed does not dictate that plaintiff be awarded attorney fees, but rather suffices only to meet threshold for award of attorney fees; award is to be made only when, in the discretion of the district court, to do so would advance a policy underlying FOIA).

As noted in the Court's summary of this litigation, Ms. Pohl asserted both substantive and procedural claims against the Government Defendants arising out of the processing of her FOIA request.  The substantive claims were set forth in Counts I, II and III of the amended complaint.  The same conduct, i.e., the Government Defendants' failure to obtain and produce the research data that was the subject of Ms. Pohl's FOIA request, formed the basis for the substantive claims in Counts I and II of the amended complaint. However, Count I was brought under FOIA, while Count II was brought under the APA.  The substantive claim in Count III, alleging the Government Defendants adopted a policy of refusing to obtain research data requested pursuant to revised OMB Circular A-110, also was brought under the APA.

In ruling on the Government Defendants' motion to dismiss the substantive claims asserted by Ms. Pohl under the APA in Counts II and III of the amended complaint, the Court concluded that FOIA did not provide an adequate remedy for these claims.  Thus, the Government Defendants' motion to dismiss the APA claims in Counts II and III was denied.  Specifically, the Court stated:

                    *    *    *

     Based on documentary evidence attached to the Amended
Complaint, none of the Government Defendants "created or
obtained" the Study Data nor were they, at the time of Ms.
Pohl's request, in control of those data.  Thus, if only FOIA
were applicable here, the Government Defendants would have no
obligation to provide the information she sought because it does
not satisfy the definition of "agency record."  However, EPA and
HHS regulations, adopted pursuant to OMB Circular A-110, now
require the agency to request such research data even if they
are not, at the time of the FOIA request, in the agency's
possession.  FOIA itself does not contain this requirement and
cannot provide an adequate remedy for the agency's failure to do
so.  Thus, Plaintiff has stated a claim under the APA when she
alleges in Count II that the Government Defendants failed to
obtain the Study Data as required by their own regulations.  The
Government Defendants' motion to dismiss Count II is therefore
denied.

     In Count III, Plaintiff alleges that the Government
Defendants "consciously and expressly" adopted a policy of
refusing to obtain data produced under a government award and
used in developing an action that has the force and effect of
law.  Again, nothing in FOIA requires an agency to obtain
information it does not already control.  Therefore, even if
Plaintiff could establish that one or more of the agencies had a
policy of refusing to do so, no recourse could be obtained under
that Act.  The motion to dismiss Count III is denied for reasons
parallel to those set out in the previous paragraph.

                    *    *    *

(Doc. No. 48, pp. 12-13).

As noted by the Government Defendants, the foregoing decision

constitutes the law of the case.  (Doc. No. 87, p. 11).  Therefore,

there is no basis for awarding attorneys' fees and costs to Ms. Pohl

under FOIA based on the substantive claims in Counts I, II and III of

the amended complaint.[32]

---

32 Contrary to Ms. Pohl's argument (Doc. No. 93, pp. 2-4), the Government
Defendants' failure to move to dismiss the FOIA claim in Count I of the amended

The procedural claims against the Government Defendants under FOIA in Count V of the amended complaint were based on (a) the EPA's referral of Ms. Pohl's FOIA request to HHS for processing after her successful appeal to the EPA's National FOIA Officer, and (b) HHS's failure to decide Ms. Pohl's appeal from the denials of her FOIA request by the CDC and NIH in a timely manner.[33]  To establish that she substantially prevailed on her procedural FOIA claims, which would make her eligible for an award of attorneys' fees and costs under FOIA, Ms. Pohl must show that she obtained relief through either (1) "a judicial order, or an enforceable written agreement or consent decree" or (2) "a voluntary or unilateral change in position by the agency, if [her] claim is not insubstantial."[34]  5 U.S.C. § 552(a)(4)(E)(ii).

---

complaint, which clearly would have been granted based on the Court's rationale for allowing her APA claims in Counts II and III to proceed, does not alter the fact that Ms. Pohl failed to state a substantive claim under FOIA.  Therefore, Counts I, II and III cannot serve as the basis for an award of attorneys' fees and costs under FOIA.

33 As noted previously, in the Court's Memorandum and Order filed October 29, 2010 granting in part and denying in part the Government Defendants' motion to dismiss, the Court concluded that both procedural claims brought by Ms. Pohl as a result of the processing of her FOIA request were properly brought under FOIA.  (Doc. No. 48, pp. 13-17).

34 The second basis for finding that a FOIA plaintiff substantially prevailed is commonly referred to as the "catalyst theory."  The catalyst theory assumes that a voluntary or unilateral change in an agency's position is induced by the FOIA plaintiff's lawsuit.  In Buckhannon Bd. & Care Home, Inc. v. W.Va. Dept. of Health & Human Resources, 532 U.S. 598, 603 (2001), the Supreme Court rejected the catalyst theory, holding that a FOIA plaintiff must have "prevailed on the merits" to be considered a substantially prevailing party eligible for an award of attorney fees under FOIA.  In response to Buckhannon, Congress passed the Open Government Act of 2007 ("the Act") to add the definition of "substantially prevailed" set forth in 5 U.S.C. § 552(a)(4)(E)(ii).  In essence, the Act restated the Buckhannon analysis with regard to the issue of consent decrees and revived the catalyst theory as a basis for finding that a FOIA plaintiff substantially prevailed.  See Wildlands CPR v. United States Forest Service, 558 F.Supp.2d 1096, 1098 (D.Mont.2008).

Ms. Pohl initially asserts that she substantially prevailed in this litigation because she obtained relief through a "judicial order." Specifically, Ms. Pohl asserts that the Government Defendants "delayed turning over the data to [her] for over three years, but once this Court ordered the production of the data on December 2, 2010, the [Government] Defendants took less than two months to provide Plaintiff with the ... information requested." (Doc. No. 80, pp. 10-11). After consideration, the Court finds this argument unpersuasive.

As noted by the Government Defendants, the Order on which Ms. Pohl relies to meet the threshold requirement of eligibility for an award of attorneys' fees and costs under FOIA is not the type of judicial order that satisfies 5 U.S.C. 552(a)(4)(E)(ii)(I). (Doc. No. 87, p. 13). The Court's December 2, 2010 Order merely memorialized the representations of Government counsel during a case management conference concerning the period needed to review the research data provided by CCHMC and Dr. Lanphear for exemptions before production to Ms. Pohl. The December 2, 2010 Order did not change the legal relationship of the parties. See Buckhannon Bd. and Care Home, Inc. v. West Va. Dept. of Health and Human Resources, 532 U.S. 598, 605 (2001)("Our precedents ... counsel against holding that the term 'prevailing party' authorizes an award of attorney's fees *without* a corresponding alteration in the legal relationship of the parties."); Waage v. Internal Revenue Service, 656 F.Supp.2d 1235,

1239 (S.D.Ca.2009)(Plaintiff may not recover attorney fees under FOIA based on an order by a magistrate judge documenting the parties' settlement; magistrate judges may not rule on motions for injunctive relief or render summary judgment).

As further noted by the Government Defendants, the Court's December 2, 2010 Order did not relate in any way to Ms. Pohl's procedural claims, the only claims in the amended complaint the Court has concluded could be brought under FOIA. (Doc. No. 87, p. 14). Simply put, the Order had nothing to do with Ms. Pohl's complaint concerning the EPA's referral of her FOIA request to HHS for processing after the favorable ruling by the EPA's National FOIA Officer or her complaint about HHS's delay in processing her appeal.

Finally, the Court agrees with the Government Defendants that its December 2, 2010 Order cannot be construed as "judicial relief" rendering Ms. Pohl eligible for an award of attorneys' fees and costs under FOIA "because the agencies still had the right to withhold certain documents as nonresponsive to [Ms. Pohl's] request or exempt from production under FOIA, and the merits of any agency withholding were never addressed by this Court." (Doc. No. 87, p. 15).

Ms. Pohl also asserts that she substantially prevailed in this litigation under the catalyst theory. Specifically, Ms. Pohl contends:

> Once this Court denied Defendants' Motion to Dismiss, the
> Government *obtained* and *produced* the requested data to
> Plaintiff. Notably, the Government no longer claimed that these

data were exempt from disclosure under 45 CFR § 74.36(d)(1)(a), as the CDC had asserted.  Nor did the Government argue that the data were not subject to disclosure because there was no connection between the data and a federal grant, as NIH had claimed.  By relinquishing these specious positions, which had forestalled production for years, the Government "change[d]" its "position."[35]

(Doc. No. 80, p. 12).

Again, the Court finds Ms. Pohl's argument unpersuasive.

The Court agrees with the Government Defendants that the only change in position in this case occurred after Ms. Pohl filed her amended complaint and that change was on the part of Dr. Lanphear. Prior to being added as a defendant in Ms. Pohl's amended complaint (and the EPA's decision on Attorney Steinwurtzel's FOIA request for the research data analyzed in the Lanphear Study), Dr. Lanphear refused to comply with the CDC's numerous requests for the research data or copy of the co-investigators' confidentiality agreement on which he relied in arguing that the research data was exempt from revised OMB Circular A-110.  Within a month of filing an answer to Ms. Pohl's amended complaint, however, CCHMC and Dr. Lanphear produced the research data, and, on the very same day, Government counsel informed Ms. Pohl's counsel that the agencies would begin processing her FOIA request for exemptions.  As noted by the

---

35 One of Ms. Pohl's issues with the processing of her FOIA request arises out of the fact that the CDC and NIH provided different reasons for denying the request. Unlike the grant awarded by the CDC for the Lanphear Study, however, there is no evidence contradicting the NIH's claim that the NIEHS grant was used solely to fund a workshop at which no research data was produced or analyzed, a requirement for production of information under revised OMB Circular A-110.  Thus, the fact that the reasons proffered by the CDC and NIH for denying Ms. Pohl's FOIA request differed is irrelevant and provides no support for her claims in this case.

Government Defendants, this action is entirely consistent with the CDC's position that it could not obtain the research data from CCHMC and Dr. Lanphear.  In sum, the Court finds no causal connection between the filing of this case and the Government Defendants' production of the requested research data.

Finally, the Court finds that Ms. Pohl's procedural FOIA claims were insubstantial, precluding a determination that she is eligible for attorneys' fees and costs under FOIA.  As to the EPA's referral of Ms. Pohl's FOIA request to HHS, it is clear that the EPA could have processed the request under revised OMB Circular A-110 because it was an awarding agency with regard the Lanphear Study.  However, HHS also was an awarding agency with substantial interest in the Lanphear Study.  Therefore, the processing of Ms. Pohl's FOIA request under revised OMB Circular A-110 by HHS was proper.  In any event, there is no evidence Ms. Pohl objected to the EPA's referral of her FOIA request to HHS.  Under the circumstances, the Court finds she waived any claim arising out of it.[36]

---

36 In connection with the decisions rendered by the CDC and NIH following the EPA's referral of Ms. Pohl's FOIA request, the Court also notes that the EPA's National FOIA Officer merely concluded on appeal that Ms. Pohl was entitled to the processing of her request due to a change in circumstance since the request was made and denied, i.e., the EPA's subsequent issuance of an Advance Notice for Proposed Rulemaking for revision of the NAAQS for lead which cited the Lanphear Study.  Following the EPA's referral of the FOIA request, the CDC and NIH complied with the ruling on appeal by promptly proceeding to process Ms. Pohl's FOIA request.  Thus, the Court finds Ms. Pohl's characterization of the CDC and NIH denials as impermissible reversals of the decision of the EPA's National FOIA Officer to be meritless.

As to the length of time Ms. Pohl's appeal was pending before HHS, the Court concludes that the delay did not result in any harm to Ms. Pohl. Therefore, this procedural claim also is insubstantial. A regulation of HHS specifically states: "If we fail to meet the deadlines, you may proceed as if we had denied your request or your appeal." 45 C.F.R. § 5.35(a). Accordingly, Ms. Pohl could have initiated this litigation 21 days after the appeal, which was filed on January 9, 2009, reached the appropriate review official and was not decided. It is unclear why Ms. Pohl chose to wait until November 9, 2009 to file her complaint.[37]

Based on the foregoing, Ms. Pohl's motion for an award of attorneys' fees and costs under FOIA will be denied.

*William L. Standish*
William L. Standish
United States District Judge

Date: March _6_, 2012

---

[37] Because the Court concludes that Ms. Pohl has failed to establish eligibility for an award of attorneys' fees and costs under FOIA, there is no need to discuss the issue of entitlement to such fees and costs.